IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VAN WILLIAMS<br>26 Brookside Road<br>West Orange, NJ 07052<br><br>   Plaintiff,<br>v.<br><br>CASCADES, INC. *d/b/a* CASCADES<br>1 Turner Place<br>Piscataway, NJ 08854<br> and<br>CASCADES HOLDING US INC.<br>4001 Packard Road<br>Niagara Falls, NY 14303<br><br>   Defendant. | **CIVIL ACTION**<br><br>**No.:**<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, Van Williams (*hereinafter* referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

### INTRODUCTION

1. Plaintiff has initiated this action to redress violations by Cascades, Inc. *d/b/a* Cascades and Cascades Holding US Inc. *d/b/a* Cascades (*hereinafter* collectively referred to as "Defendants") of the Americans with Disabilities Act, as amended ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*); and the New Jersey Law Against Discrimination ("NJ LAD"). Plaintiff asserts, *inter alia*, that he was discriminated against and unlawfully terminated by Defendants. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

### JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for violations of federal laws.

3. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the District of New Jersey.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. Defendant Cascades, Inc. *d/b/a* Cascades, upon information and belief, is a containerboard packaging plant located at 1 Turner Place, Piscataway, New Jersey. Plaintiff was hired through and worked at this location.

8. Defendant Cascades Holding US Inc., upon information and belief, is a management services business/industry within the engineering, accounting, research, and management sector located at 4001 Packard Road, Niagara Falls, New York. Plaintiff's paystubs and W-2 forms list Defendant Cascades Holding US Inc. as Plaintiff's employer located at that address.

9. Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors Defendants are sufficiently interrelated and integrated in their activities, labor relations,

ownership, and management that they made be treated as a single and/or joint employer for purposes of the instant action.

10. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

## FACTUAL BACKGROUND

11. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12. Plaintiff was employed with Defendants from in or about April of 2018 until his unlawful termination (as discussed *infra*) on or about August 2, 2018. Plaintiff was initially hired by Defendants as a forklift driver.

13. At all relevant times during Plaintiff's employment with Defendants, Plaintiff suffered from and continues to suffer from several disabilities including Diabetes, and prostate and bladder cancer (in addition to other complications).

14. As a result of his aforesaid health conditions, Plaintiff experienced fatigue, nausea, vomiting, and erratic blood sugar, which (at times) limits his ability to perform some daily life activities, including but no limited to sleeping, working, and focusing (among other daily life activities).

15. Despite his aforesaid health conditions and limitations, Plaintiff was able to perform the duties of his job well with Defendants; however, Plaintiff did require reasonable accommodations while employed with Defendants (as discussed *infra*).

16. For example, upon Plaintiff's hire, he informed Defendants' recruiter, Danielle Knight (*hereinafter* "Knight") that he needed to work a day shift position for medical reasons. Knight assured Plaintiff that "it would not be a problem."

17. Plaintiff was primarily supervised by day shift supervisor, Art (last name unknown, *hereinafter* "Art") and later (as discussed *infra*) generally supervised by night shift supervisor, Tom (last name unknown, *hereinafter* "Tom").

18. Plaintiff worked what is commonly referred to as first shift hours (from 6:00 a.m. to approximately 2:30 p.m.) for the first month of his employment with Defendants in the shipping/receiving department, during which he primarily drove a forklift, unloaded trucks, and trained on the corrugating cardboard machine. However, ***the bulk of his time in this position was spent seated on the forklift***.

19. In or about May of 2018, Plaintiff was ***involuntarily*** converted to an overnight shift (with hours generally from 10 p.m. to 4 a.m.) for no legitimate reason.

20. While assigned to the overnight shift, Plaintiff worked on his feet the entire time, running back and forth putting lids on boxes that rapidly traveled down a conveyer on the unitizer machine.

21. Plaintiff avers that the overnight shift was faster-paced and more laborious than the aforesaid first shift he was assigned during the first approximate month of his employment.

22. Plaintiff informed Art that he had previously requested a reasonable accommodation of day shift hours because of his medical conditions, which were being exacerbated by working the overnight shift. Plaintiff explained to Art that being on his feet, performing a more laborious job was causing him severe fatigue and nausea, and that he was unable to take periodic breaks to take his medication or snack to maintain his blood sugar.

23. In response to apprising Art of his aforesaid health conditions and need for accommodations, Art advised Plaintiff to "do what he had to do." However, in order to keep up with Defendants' production schedule and the speed of the unitizer machine, Plaintiff was often

unable to take breaks, and Tom (who supervised multiple departments in the overnight shift) was usually unavailable for Plaintiff to reach out and request a break.

24. Furthermore, as discussed supra, Plaintiff required breaks to take his medication and eat small meals in order to keep his blood sugar under control; however, employees were not permitted to eat on the department floor – only in the lunchroom – which was to far away for Plaintiff to have time to eat, take his medication, and still maintain Defendant's required production schedule on night shift.

25. Defendants' bathrooms were also inconveniently located, which became a problem for Plaintiff as his serious health conditions were exacerbated by the overnight shift causing nausea and vomiting.

26. In an effort to maintain his employment with Defendants, Plaintiff in good faith attempted to continue to work the overnight shift until on or about June 25, 2018, at which time, Plaintiff's serious health conditions were deteriorating substantially and he called out sick from work.

27. Between on or about June 25, 2018 and July 3, 3018, Plaintiff requested days off as a result of his disabilities. During this time, Plaintiff reiterated to Defendants' management, including but not limited to Art, that he needed the very easy accommodation of not being mandated to work overnight shifts.

28. On or about July 3, 2018, Defendants' Human Resources Manager, Alex Fowlie (*hereinafter* "Fowlie"), reached out to Plaintiff via telephone, informing Plaintiff that he had been advised of Plaintiff's serious health conditions by Defendants' management and requested doctors' notes from Plaintiff regarding his serious health conditions. Plaintiff informed Fowlie that he would be seeing his doctor shortly for an evaluation and would provide Fowlie with the paperwork requested.

29. On or about July 6, 2018, Fowlie reached back out to Plaintiff via text, stating "Please provide an update to me by the end of today via email as to your status. Also, remember if your intention is to come back to work you must be fully cleared by your doctor with no restrictions. If you do not intend to come back to work please communicate that to Cascades." Plaintiff responded that he "didn't forget about" Fowlie, that he had seen his doctor and was waiting for his doctor to provide the evaluation.

30. In response to Plaintiff's text, on or about July 6, 2018, that he would be providing an evaluation to Fowlie soon, Fowlie advised Plaintiff that "Cascades will need something by Monday [July 9, 2018] morning at the latest as to your status. If we don't receive anything we will assume you have resigned per the job abandonment section of our attendance policy." Plaintiff replied that "I have not indicated that I resigned or abandoned my job, I will return back to work per my doctors [sic] evaluation."

31. On or about July 9, 2018, Plaintiff provided to Fowlie a note from his doctor which stated "Mr. Williams is a long term patient of this practice and requires regular follow up work with his PCF and specialist due to multiple medical conditions. He also needs to take his medications regularly. His medical care has been affected because of night hours. I request patient be given option for daytime shift."

32. On or about July 11, 2018, Plaintiff presented Fowlie with another doctor's note which recommended that "[e]ffective immediately, [Plaintiff is] unable to stand for long periods of time."

33. In response to Plaintiff's aforesaid July 9th and 11th doctor's notes requesting that Plaintiff be given the option of daytime shifts and indicating that he could not stand for long periods of time, Fowlie sent Plaintiff a letter on or about July 13, 2018, advising Plaintiff to "provide a doctor's note to explain your absences from work from Monday, June 25, through

Monday, July 9," or he would be subjected to termination under Defendants' attendance policy. Fowlie's letter further advised Plaintiff that he was required to have the attached medical questionnaire completed by his doctor "so that we can understand your medical restrictions and what accommodation(s) are being sought."

34. On or about July 16, 2018, Plaintiff's doctor completed Defendants' required medical questionnaire, which "strongly recommended" that Plaintiff "work no more than 8 hour shifts daily as a Shipper Receiver job position" (a first shift position) and "perform his duties during the day." Plaintiff's doctor further provided that Plaintiff's medical conditions required "rest periods during work and time to monitor health status"; "time off for medical procedures + visit[s] as required by his physicians . . . who can provide doctors notes upon . . . request;" and "constant monitoring and rest periods, adequate sleep, meals, etc.," and that a "facility that provides some medical assistance + care would help." Plaintiff faxed the completed medical paperwork to Fowlie on or about July 17, 2018.

35. Shortly after Fowlie received Plaintiff's completed medical questionnaire, Fowlie contacted Plaintiff and informed him that he would "check on what we have position-wise."

36. On or about July 30, 2018, Fowlie advised Plaintiff that he had two laborer positions available – one of which was a second shift position from 2 p.m. until 10 p.m., and both of which resulted in in less pay and more strenuous duties than the forklift shipper/receiver position Plaintiff initially held with Defendants.

37. After Fowlie presented Plaintiff with the aforesaid two job positions, Plaintiff asked Fowlie if either position conformed to his doctor's restrictions, to which Fowlie replied "no." Because both laborer positions required Plaintiff to work against his restrictions and would exacerbate his health conditions, Plaintiff rejected the Positions.

38. After Plaintiff rejected the aforesaid positions because they were not considered "reasonable accommodations" and actually went against his doctor's recommendations, Fowlie informed Plaintiff that he would reach back out to him on August 4, 2018, after seeing what other positions he could find.

39. On or about August 4, 2018, Plaintiff received a termination letter from Fowlie informing him that the facility had no "open positions for which you are qualified that would meet your medical restrictions." As a result, Fowlie informed Plaintiff that "Cascades is terminating your employment effective August 2, 2018."

40. Despite Defendants' assertions to the contrary, Plaintiff believes and therefore avers that Defendants operate multiple locations in close proximity to one another with many available shifts and jobs that would have conformed to his medical restrictions, including his original position that he was involuntarily removed from for no logical or legitimate reason.

41. Defendants were required to provide Plaintiff with reasonable medical accommodations under the ADA.

42. Rather than accommodate Plaintiff's very reasonable requests of time off for doctors' appointments and for the care and treatment of his serious health conditions; the ability to work day shifts only; short periodic breaks for medication, food, and/or rest; and the ability to not work over 8 hours or stand for long periods of time (all reasonable accommodations under the ADA), Defendants instead failed to meaningfully engage in the interactive process and provide him with reasonable accommodations, and ultimately terminated his employment.

43. Plaintiff believes and therefore avers that he was terminated because of (1) his known, perceived, and/or record of disabilities; (2) in retaliation for requesting/utilizing reasonable medical accommodations; and/or (3) Defendants' complete and utter failure to accommodate his health conditions.

## COUNT I
### Violations of the American's with Disabilities Act, as amended ("ADA")
([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; and [3] Failure to Accommodate)
-Against Both Defendants-

44. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

45. Plaintiff suffered from qualifying health conditions under the ADA which affected his ability (at times) to perform some daily life activities including, but not limited to, lifting, performing manual tasks, and working.

46. Plaintiff requested reasonable accommodations from Defendants, including but not limited to time off for doctors' appointments and for the care and treatment of his serious health conditions; the ability to work day shifts only; period breaks for medication, food, and/or rest; and the ability to not work over 8 hours or stand for long periods of time.

47. Plaintiff was terminated from his employment with Defendants on or about August 2, 2018.

48. Defendants memorialized in writing that Plaintiff was terminated from his employment because the facility had no "open positions for which you are qualified that would meet your medical restrictions."

49. Upon Plaintiff's information and belief, Defendants operate multiple locations in close proximity to one another with many available shifts and jobs that would have conformed to his medical restrictions (including the original position he was hired for, which he was later involuntarily removed from).

50. Prior to abruptly terminating Plaintiff's employment, Defendants failed to meaningfully engage in the interactive process and accommodate Plaintiff as required under the ADA.

51. Plaintiff believes and avers that he was terminated from his employment with Defendants because of: (1) his known and/or perceived disabilities; (2) his record of impairment; (3) his requested accommodations; and/or (4) Defendants' failure to engage in the interactive process and/or to accommodate his disabilities.

52. These actions as aforesaid constitute violations of the ADA, as amended.

## COUNT II
### Violation of the New Jersey Law Against Discrimination (NJ LAD)
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; and [3] Failure to Accommodate)**

53. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

54. Plaintiff reasserts each and every allegation from Count I, as such actions in this case constitute identical violations of the NJ LAD.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E.      Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

                                        Respectfully submitted,

                                        **KARPF, KARPF & CERUTTI, P.C.**

                                By:     _____
                                        Ari R. Karpf, Esq.
                                        3331 Street Road
                                        Two Greenwood Square, Suite 128
                                        Bensalem, PA 19020
                                        (215) 639-0801

Dated: March 19, 2019